[Cite as *State v. Stefanko*, 2026-Ohio-1143.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

ERICA STEFANKO

    Appellant

C.A. No.    31056

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2012-07-1887-B

DECISION AND JOURNAL ENTRY

Dated: March 31, 2026

CARR, Presiding Judge.

{¶1}    Defendant-Appellant Erica Stefanko appeals the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}    On the evening of June 20, 2012, A.B. was working as a pizza delivery driver at a local Domino's.  Shortly before midnight, a female called in and ordered a pizza to be delivered to the back door of a nearby business.  At the time, only A.B. and the manager were working. After the pizza was ready, A.B. left to deliver it.  When A.B. did not return as expected, the manager drove out to the delivery address to try to find her.  The manager pulled in the parking lot of the closed business and saw what appeared to be a puddle of blood.  The manager left the parking lot and called the police on his way back to the store.  The manager also called A.B.'s girlfriend, B.D., who met the manager at the shop.

{¶3} When the police arrived, B.D. told police that A.B. was in a custody dispute with Chad Cobb, who was the father of A.B.'s daughter, G.C. Police were also dispatched to the location of the pizza delivery. The parking lot was empty, but police observed blood and signs of a struggle. Police then began searching for A.B.'s vehicle. One officer proceeded to Cobb's grandparents' home. At the rear of the property, behind a detached garage, the officer discovered a running Lincoln Navigator. No one was in the driver's seat. A woman, later identified as Stefanko, who was, at the time, married to Cobb, was in the passenger seat, and four small children were in the rear of the vehicle. The vehicle was registered to Cobb. Stefanko appeared calm and claimed not to know what was going on. The officer then heard what sounded like heavy footsteps in the nearby woods. When backup arrived, police discovered Cobb crouching behind a tree in the wooded area. Cobb was then taken into custody.

{¶4} Later that morning, a woman in Wayne County noticed what appeared to be a vehicle in the back of a nearby field that had been planted with corn. The woman thought this was odd and called the sheriff's department. When police came out, they discovered A.B.'s car. A.B. was found deceased in the back of the vehicle. She had a zip tie secured around her neck and had various other injuries. Ultimately, it was determined that her cause of death was strangulation.

{¶5} Cobb's and Stefanko's property was searched and items police believed were used in the attack and murder of A.B. were found there. The items included men's camouflage clothing, some pieces which had potential blood staining, zip ties which were three to four feet long, a Taser-like device, a diving knife, duct tape, and gloves with hardened knuckles.

{¶6} Cobb was indicted on multiple felony counts related to the death of A.B., including aggravated murder. Death penalty specifications accompanied some of the charges. In exchange

for the removal of the death penalty specifications, Cobb pleaded guilty. He was sentenced to life in prison without the possibility of parole.

{¶7} Years later, after a recording between Cobb's mother and Stefanko came to the attention of authorities and an additional witness came forward, Stefanko was charged with multiple felonies, included aggravated murder, in connection with the death of A.B. Several charges were later dismissed. A jury found Stefanko guilty of one count of aggravated murder and one count of murder. Stefanko was sentenced to life in prison with parole eligibility after 30 years.

{¶8} Stefanko appealed, and this Court reversed the judgment of the trial court concluding that the trial court violated her right to confront witnesses when Cobb was allowed to testify remotely due to the COVID-19 pandemic. *State v. Stefanko*, 2022-Ohio-2569, ¶ 34 (9th Dist.).

{¶9} In January 2024, the matter proceeded to a second jury trial. The jury was instructed as to complicity via aiding and abetting. The jury again found Stefanko guilty of aggravated murder and murder. She was sentenced to life in prison with the possibility of parole after 30 years.

{¶10} Stefanko has appealed, raising a single assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} In her sole assignment of error, Stefanko argues that the findings of guilt are against the manifest weight of the evidence. Stefanko asserts that only Cobb's statements at trial directly implicate her in the murder of A.B. and Cobb denied killing A.B. Thus, according to Stefanko, Stefanko could not be found to be an accomplice in A.B.'s murder. Stefanko asserts that her

statements to Cobb's mother on the audio recording are "equivocal at best." She further notes that there was no DNA evidence to connect her to the crimes.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id*. "We are mindful that the jury is free to believe all, part, or none of the testimony of each witness. This Court will not overturn a conviction on a manifest weight challenge only because the jury found the testimony of certain witnesses to be credible." (Internal quotations and citations omitted.) *State v. Carter*, 2024-Ohio-5295, ¶ 22 (9th Dist.).

{¶12} R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another . . . ." "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill." *State v. Roberts*, 2025-Ohio-5120, ¶ 144, quoting *State v. Walker*, 2016-Ohio-8295, ¶ 18. "The question is whether [the] defendant acted with advance reasoning and purpose to kill." (Internal quotations and citations omitted.) *Roberts* at ¶ 146. "And when the evidence presented at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." (Internal quotations and citations omitted.) *Id.*

> [T]here are three pertinent considerations in determining whether prior calculation and design exist: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to

choosing the murder weapon or murder site? and (3) Was the act drawn out or an almost instantaneous eruption of events?

(Internal quotations and citations omitted.) *Id.* at ¶ 147.

{¶13} R.C. 2903.02(A) states that "[n]o person shall purposely cause the death of another . . . ." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶14} "To support a conviction for complicity by aiding and abetting . . . , the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Suggs*, 2024-Ohio-1961, ¶ 14 (9th Dist.), quoting *State v. Johnson,* 93 Ohio St.3d 240 (2001), syllabus. "Such intent may be inferred from the circumstances surrounding the crime, the presence, companionship, and conduct of the defendant before and after the offense is committed." (Internal quotations and citations omitted.) *Suggs* at ¶ 14.

{¶15} After a thorough and independent review of the voluminous record in this case, we can only conclude that Stefanko has failed to demonstrate that the jury lost its way in finding her guilty of the charges. Given the extent and nature of the record, only those portions necessary to resolve the arguments raised in Stefanko's assignment of error will be discussed.

{¶16} A.B. and Cobb never married but had a child together who was born in 2005, G.C. A.B.'s and Cobb's relationship ended not long after G.C. was born. Ultimately, Cobb began dating Stefanko, who had a child from a prior relationship around the same age as G.C. G.C. spent much of her early childhood in the custody of Cobb. In 2009, Cobb and Stefanko had a child together and married in 2010. A second child was born in 2012, months before the murder.

{¶17} Matters became contentious between A.B. and Cobb in late 2011 when A.B. reentered G.C.'s life and obtained temporary custody. At the time, A.B. was living with her girlfriend, B.D. Cobb obtained an attorney and hoped to regain full custody of G.C. According to Cobb, the attorney advised him to contact authorities periodically to conduct wellness checks on G.C. at A.B.'s and B.D.'s residence. Cobb also had his mother buy a GPS tracker to put on A.B.'s car to track her movements. Additionally, Cobb and Stefanko were involved in a plot involving planting drugs in B.D.'s car. Cobb obtained marijuana and it was then planted in B.D.'s car. Stefanko admitted at trial to calling the police on B.D. so that her car would be searched. The car was searched but ultimately no charges resulted. Cobb was angry that the plan had failed. He also became more frustrated as time passed, and the custody battle continued. According to Stefanko, it reached a tipping point when the guardian ad litem in the custody case indicated that she did not know who to believe. Cobb was at a loss as to what to do. Stefanko admitted that she hated A.B. and had a rivalry with her.

{¶18} Stefanko testified that Cobb then planned to obtain some methamphetamine, secretly plant it in A.B.'s car, and then Stefanko would call the police on her so the police would find the drugs. To ensure that A.B.'s car would be available for Cobb to plant the drugs, it was also Stefanko's role to call the Domino's where A.B. worked, order a pizza, and have it delivered to the back of a closed business. Cobb believed this plan would help ensure that he got custody of G.C. It was Stefanko's testimony that this is what she believed the plan was on the night A.B. was killed.

{¶19} Stefanko testified as follows to the events of June 20, 2012, and June 21, 2012. At some point in the evening, Cobb called her and told her to pick him up at his father's workplace. Stefanko took all four children, including G.C., in the Lincoln Navigator and went to meet Cobb.

When she got there, Cobb told Stefanko that, "[A.B.'s] about to get arrested." Cobb was wearing regular clothes and had a backpack with him. Stefanko did not see that he had any weapons or zip ties. Stefanko and Cobb each had a burner cell phone; they had purchased minutes for the phones while they were at Walmart together on June 18, 2012.

{¶20} Cobb drove the family past the Domino's pizza where A.B. worked and confirmed that she was in fact working. He then drove to a business on Turkeyfoot Lake Road next to the closed commercial building where A.B. was murdered. Stefanko placed the pizza order using a false name and had it delivered to the back door of the building next door. Cobb then headed into the woods towards the area of the other building. Stefanko was to wait until Cobb called her.

{¶21} About half an hour later, Stefanko received a call from Cobb. Cobb told her to meet him at a bridge in Wayne County near his parents' house. He said that he had A.B.'s car. Stefanko did not understand why Cobb would have A.B.'s car.

{¶22} Stefanko drove out to the bridge and waited for Cobb. Eventually, Cobb came walking out of a cornfield. It appeared there was blood on Cobb's shirt. Cobb told Stefanko to drive them home. When they got home, Cobb went inside and showered. Stefanko then learned that A.B. was dead. Stefanko felt sick and vomited into the toilet.

{¶23} Cobb then demanded that they all go back to the location of the pizza delivery to get A.B.'s phone, which Cobb left there. Cobb drove Stefanko and the four children. As they drove past the business, Cobb noticed police activity there and so did not stop. Cobb then drove to his grandparents' house. Police would find Cobb in the surrounding woods and arrest him. Stefanko was taken to the police station but was not arrested. At trial, Stefanko testified that it was her belief that Cobb purposefully murdered A.B. Stefanko denied that they ever talked about killing A.B.

{¶24} Cobb, who was offered nothing in exchange for his testimony, testified to a different version of events. Cobb asserted that on June 20, 2012, in the evening, he was home with two children and Stefanko was out with the two other children. He got a phone call and went to meet Stefanko at his father's place of employment. He was told to bring the camouflage backpack, but he did not know what was in it aside from a flashlight. Cobb testified he did not pack it. He was wearing camouflage clothing.

{¶25} Stefanko arrived in the Lincoln Navigator and Cobb got in the passenger seat. The children were in the back. Stefanko drove them past the Domino's pizza where A.B. worked. A.B. was working at the time. Stefanko drove to the closed business where A.B. was ultimately killed. Stefanko and Cobb got out of the vehicle and had a ten-minute conversation under a tree. Afterward, Stefanko called the Domino's pizza and ordered a pizza using a different name. She asked that the pizza be delivered to the back of the business. The two then had another conversation under the tree. Stefanko then got into the vehicle and left the scene. Cobb never mentioned a plan to plant methamphetamine in A.B.'s car during his testimony.

{¶26} A short time later, A.B. arrived. She became "pretty worked up" when she saw Cobb. A.B. did not leave the parking lot alive. Cobb testified that "that night was done with two people involved[,]" Cobb and Stefanko. However, Cobb denied killing A.B. He also insinuated that any plan was Stefanko's as the only prior calculation and design he had was to go on a scheduled trip to Disney World. Cobb never identified any plan during his testimony with respect to A.B. and the events of June 20, 2012. Cobb denied having a plan to kill A.B. Nonetheless, Cobb admitted to using the Taser-like device on A.B. after she threw her phone at him. Cobb and A.B. then got into what Cobb described as "a really bad fight." After the fight, A.B. was barely moving.

{¶27} Cobb claimed that he did not have zip ties on him that evening and that Stefanko put a zip tie around A.B.'s neck. Cobb stated that his cable installation company did have a lot of different zip ties that were used in the business but there would be no reason to have the zip ties at issue in the Lincoln Navigator. Cobb admitted to also having a diving knife on his person and duct tape on his jacket; although he denied using duct tape on A.B. Cobb testified that he was not wearing gloves that night.

{¶28} Cobb put A.B.'s body in the back of her car and drove to the bridge in Wayne County. Stefanko followed behind in the Lincoln Navigator. Stefanko stopped at the bridge, and Cobb drove A.B.'s vehicle into the far corner of the nearby cornfield. Cobb left the car and walked back to Stefanko who was waiting for him in the Lincoln Navigator.

{¶29} They then went to their home. Cobb took all his clothes off outside and then went in to take a shower. After he showered, they all got back in the Lincoln Navigator. They took cleaning supplies and were going to go back to the crime scene to get A.B.'s phone and clean up the area. When Cobb arrived in the area, he saw police activity and kept driving. Cobb proceeded to his grandparents' house where he was later apprehended. Cleaning supplies were discovered on the ground near the Lincoln Navigator.

{¶30} When A.B.'s body was discovered in her vehicle, there were zip ties around her ankles, knees, neck, and mouth. A cartridge from a Taser-like device was discovered along with a camouflage jacket. Duct tape was found on the jacket. Wires from a Taser-like device were found attached to A.B. along with duct tape. Other evidence was discovered during a search of Stefanko's and Cobb's property. In the backyard, a sock, a belt, zip ties, a camouflage backpack, a pair of camouflage boots, a camouflage pair of pants, and a t-shirt with what appeared to be blood stains were discovered. A Taser-like device in a holster and a diving knife were also found. The

backpack contained camouflage face paint, a roll of duct tape, camouflage gloves with hardened knuckles, a neoprene mask, a flashlight with a lens to assist with night vision, and a camouflage hat.

{¶31} Further investigation and scientific analysis revealed that the miscellaneous pieces of duct tape from A.B.'s body and the camouflage jacket found in her car came from the roll of duct tape found in the backpack discovered on Stefanko's and Cobb's property during the search. The DNA profile found on Cobb's sock found at the Stefanko and Cobb property was consistent with A.B.'s DNA profile. No fingerprints of either Cobb or Stefanko were discovered on items of evidentiary value. There was no DNA linking Stefanko to the crimes. The DNA profile from the blood found in the parking lot at the pizza delivery location was consistent with A.B.'s DNA profile

{¶32} In February 2013, Cobb agreed to plead guilty to aggravated murder and other charges in exchange for the death penalty specifications being dismissed. After Cobb was sentenced and Stefanko came to visit him in prison, Cobb discovered that Stefanko was pregnant and had been having an affair with one of Cobb's best friends, M.S. M.S. and Stefanko later married. M.S. was also employed by Cobb in Cobb's cable installation business. M.S. moved into Stefanko's and Cobb's home and Cobb's business was sold. Cobb and Stefanko were divorced in 2014.

{¶33} In 2014, after Cobb had threatened to tell police about Stefanko's involvement in A.B.'s murder, Stefanko went to Cobb's mother's property to have a conversation with her. That approximately three-hour conversation was recorded by Cobb's mother. Both Stefanko and Cobb's mother had an alcoholic beverage during the conversation. Stefanko was not aware that she was being recorded. Cobb's mother stored that recording in a gun safe and came across it

years later when she was upgrading the gun safe. Ultimately, that recording was turned over to the police. That recording contains numerous inculpatory statements by Stefanko. Portions of the recording were played for the jury, and the entire recording was made available to the jury during their deliberations. Statements from the recording will be detailed below.

{¶34} In the recording, Stefanko told Cobb's mother that "if everything had been told exactly as it happened then [Cobb and I] would both be in prison right now. I don't disagree with that. That's totally the truth." She then stated that, "[He] came up with how to do it. He executed almost all of it. The part that he executed went totally awry." Stefanko also stated that Cobb said that "if this goes through and I can do this I'm going to keep her skull as a trophy." Stefanko also admitted to making the phone call and setting the meeting up and indicated that "[Cobb] said this is what we're going to do and this is your part in it and I carry out my part in it." Stefanko then stated that "I did exactly what he told me to do. And it wasn't because he was forcing me to do it or like he had a gun to my head, it was because he says this is your part and this is what you're going to do which is how it always was . . . ." More than once during the conservation, Stefanko indicated that she did not feel bad about what happened to A.B., including what happened to her during the last moments of her life. In discussing what to do about the situation with A.B., Stefanko told Cobb's mother that Stefanko told Cobb, "If this is something that you think you can do, then I'm okay with and I agree with it. If you can't do it then obviously you shouldn't do it." When Cobb and Stefanko would argue about what to do, Stefanko told him, "[T]his is the only way the situation is going to go away." Stefanko told Cobb's mother that Stefanko should have told Cobb that it was too risky but did not because she had seen him "get away with so much crazy sh*t that [she] thought he could get away with anything." Stefanko acknowledged that she should

have had the sense to know that there are some things "you just don't ever try to do." Stefanko observed that Cobb "had a perfect plan, but it didn't go the way it was supposed to go at all."

{¶35} Around the time that police obtained the audio recording, another witness who knew Cobb and Stefanko came forward. That witness and her husband sometimes socialized with Cobb and Stefanko, although they were more friendly with Cobb. Around July 2012, Stefanko came over to the home of the witness for dinner. Stefanko told the witness in a somewhat gleeful manner that the police missed evidence when they came to search the property. With respect to the night of the murder, Stefanko stated that she had dropped off Cobb where everything happened and waited for him somewhere else. Stefanko spoke of leaving the car in the cornfield and how, if it had been a different time of year, the car would have been hidden in the corn and not found. Stefanko indicated that she knew who made the phone call to the pizza place but did not say more than that. Stefanko informed the witness that Stefanko and Cobb went to Cobb's grandparents' house to hide out. Stefanko also said that she had defecated on A.B.'s grave because of all A.B. had put Stefanko through. Stefanko told the witness that she hated A.B.

{¶36} While it is true that Stefanko did not specifically state in the recorded conversation that the plan was to kill A.B. and insisted in her testimony explaining that recorded conversation that the plan was a plan to plant methamphetamine in A.B.'s car, the jury was not required to believe that. Even Stefanko acknowledged in her testimony that if the jury believed that the recorded conversation was about a plan to kill A.B., then she would be complicit.

{¶37} Stefanko also contends that she could not be guilty of complicity to commit aggravated murder and murder because Cobb himself denied murdering A.B. Once again, Stefanko seems to ignore the well settled law that "the jury is free to believe all, part, or none of the testimony of each witness." *Carter*, 2024-Ohio-5295, at ¶ 22 (9th Dist.). Given that both Cobb

and Stefanko had motivations to be untruthful, the jury would not be unreasonable in only believing portions of their testimony. Stefanko herself admitted that she lied many times about matters related to the death of A.B. and the investigation.

{¶38} There was ample evidence to support that Cobb murdered A.B. Cobb pleaded guilty to aggravated murder and numerous other charges in connection with A.B.'s death. A DNA profile consistent with A.B.'s was found on Cobb's clothing and items used in the murder, which Cobb admitted to possessing, were found at Cobb and Stefanko's property after the murder. Duct tape used in the murder was found in Cobb's backpack.

{¶39} Further, there was abundant evidence that there was a plan to murder A.B. Prior to the murder, minutes for the burner cell phones were purchased by Cobb and Stefanko at a local store. The night of the murder, the couple drove by the location of A.B.'s work to ensure that A.B. was working. Stefanko called A.B.'s work and ordered a pizza using a false name. That pizza was to be delivered late at night to the back door of a closed business. When A.B. encountered Cobb, he had a Taser-like device, a diving knife, zip ties, hardened gloves, and was wearing camouflage clothing. It is difficult to understand why Cobb would need weapons if he was only there to secretly plant methamphetamine in A.B.'s car without her noticing.

{¶40} While Stefanko maintained at trial that she did not know that Cobb had a plan to murder A.B. as that was not the plan they had discussed, Stefanko did not make mention of planting drugs during the three-hour recorded conversation. Moreover, Cobb did not indicate that there was any plan to plant drugs that night during his testimony and methamphetamine was not found when the police searched Stefanko's and Cobb's property. Given the foregoing, and the incriminating statements made during the recorded conversation, Stefanko has not demonstrated

that the jury lost its way in finding Stefanko guilty of the crimes.  The jury could have reasonably found that Stefanko and Cobb together planned the murder of A.B.

{¶41}  Stefanko's assignment of error is overruled.

III.

{¶42}  Stefanko's assignment of error is overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

FLAGG LANZINGER, J.
SUTTON, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.